## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

JEFFREY WEAVER, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

REALPAGE, INC.,
ALLIED ORION GROUP LLC,
AVALONBAY COMMUNITIES, INC.,
AVENUE5 RESIDENTIAL, LLC,
BELL PARTNERS, INC.,
BH MANAGEMENT SERVICES, LLC,
CAMDEN PROPERTY TRUST,
CORTLAND PARTNERS LLC,
CUSHMAN & WAKEFIELD, INC.,
EQUITY RESIDENTIAL,
FPI MANAGEMENT, INC.,
GREYSTAR REAL ESTATE PARTNERS, LLC,
INDEPENDENCE REALTY TRUST, INC.,
LINCOLN PROPERTY CO.,
LYON MANAGEMENT GROUP, INC.,
MIDAMERICA APARTMENT COMMUNITIES, INC.,
SECURITY PROPERTIES INC.,
SHERMAN ASSOCIATES, INC and
UDR, INC.,

      Defendants.

---

## CLASS ACTION COMPLAINT

---

      Plaintiff Jeffrey Weaver, individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to himself and upon information and belief as to all other matters, and based on the investigation of counsel,

bring this class action complaint to recover treble damages, injunctive relief, and other relief as appropriate, based on Defendants RealPage, Inc.; Allied Orion Group, LLC; AvalonBay Communities, Inc.; Avenue5 Residential, LLC; Bell Partners, Inc.; Camden Property Trust; Cortland Partners, LLC; Cushman & Wakefield, Inc.; Equity Residential; FPI Management, Inc.; Greystar Real Estate Partners, LLC; Independence Realty Trust, Inc.; Lincoln Property Co.; Lyon Management Group, Inc.; MidAmerica Apartment Communities, Inc.; Security Properties Inc.; Sherman Associates, Inc.; and UDR, Inc.'s violations of federal antitrust laws.

## I.    NATURE OF THE ACTION

1.    This action arises from Defendants' conspiracy to fix, raise, maintain, and stabilize rental housing prices in the Greater Denver Metro Area.[1]

2.    Defendants are RealPage, Inc. ("RealPage"), the developer of a software platform called "AI Revenue Management" (previously known as "YieldStar"), and several managers of large-scale residential apartment buildings that used RealPage's software platform to coordinate and agree upon rental housing pricing, among other things, in the Greater Denver Metro Area.

3.    AI Revenue Management works by collecting vast amounts of non-public data from its client property managers regarding lease transactions, rent prices, occupancy levels, and virtually every other possible data point that drives rent.  This data is fed into an algorithm, along with additional data collected from Defendant RealPage's myriad other data analytics and rental management software products.  RealPage's algorithm uses that data to generate a rental price

---

[1]    As used throughout this Complaint, the Greater Denver Metro Area is coterminous with the Denver–Aurora–Lakewood, CO Metropolitan Statistical Area, as established by the United States Office of Management and Budget.  Specifically, the Greater Denver Metro Area consists of the City and County of Denver, Arapahoe County, Jefferson County, Adams County, Douglas County, the City and County of Broomfield, Elbert County, Park County, Clear Creek County, and Gilpin County.  References to Denver throughout this Complaint, unless specifically limited, refer to the Greater Denver Metro Area.

for each of RealPage's client's available units, which is updated daily. RealPage makes sure all of its clients know that to maximize revenues, they must accept the software's rental price at least 80%-90% of the time, and RealPage's "Revenue Management Advisors" monitor clients' compliance with that recommendation. As the allegations and evidence set forth below demonstrate, RealPage and the property managers who use its revenue management services constitute a price-fixing cartel, and the revenue growth they have achieved is possible only through coordinated price setting.

4.    With the assurance that their competitors are setting Denver rental prices using the same algorithm, each Defendant property manager could allow a larger share of their units to remain vacant while maintaining higher rental prices across their properties. This increased their revenue at the expense of renters.

5.    Defendants' strategy only succeeded because of the pricing coordination among competing property managers enabled by this cartel. Knowing this, Defendant RealPage repeatedly and explicitly emphasizes that for the software to work properly, everyone needs to accept its suggested price at least 80%-90% of the time. As one property manager using RealPage put it: "*[W]e are all technically competitors* . . . *[but RealPage] helps us work together* . . . to work with a community in pricing strategies, not to work separately."

6.    Before the introduction of coordinated rent-setting software, residential property managers generally set prices independently, to maximize occupancy. Allowing apartments to stand vacant in Denver at their advertised rental prices made little sense when similar apartments in the area were available for less. Thus, in the past, Denver property managers had an incentive to lower rents until all available units were occupied. Allowing apartments to sit, unoccupied, would not be a profitable strategy unless there was some assurance or expectation that other

Denver property managers would similarly allow their units to remain vacant without lowering rents. Defendant RealPage's software provides that assurance.

7.      Beyond the anticompetitive exchange of nonpublic and competitively sensitive information among competing property managers, Defendant RealPage uses additional mechanisms to facilitate coordination among cartel members and prevent cheating by conspiracy participants. First, by allowing property managers to outsource their rent-setting process, RealPage causes them to consider higher rent prices than they ever would have before. In the words of an executive at one of RealPage's major clients: "The beauty of YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it."[2]

8.      Second, Defendant RealPage polices cartel members by applying heavy pressure on them to accept the algorithm's suggested price at least 80%-90% of the time. The AI Revenue Management service includes more than its rent-setting algorithm. Clients can expect constant communication with one or more of RealPage's Revenue Management Advisors who provide "expert oversight of [clients'] pricing strategy."[3] Any client property manager who chooses to diverge from the algorithm's price is expected to provide justification to a Revenue Management Advisor.

9.      Third, the software also recommends lease renewal dates for its clients' properties. Using Defendant RealPage's vast store of data on lease transactions, the algorithm suggests dates that are staggered to avoid temporary periods of oversupply resulting from the

---

[2]      Heather Vogell, *Rent Going Up? One Company's Algorithm Could Be Why,* PROPUBLICA (Oct. 15, 2022) (quoting Kortney Balas, director of revenue management at JVM Realty).

[3]      *RealPage AI Revenue Management,* REALPAGE, INC., https://www.realpage.com/assetoptimization/ revenue-management/ (last visited Dec. 7, 2022).

natural ebb and flow of the market.[4]  This further reduces the incentive for property managers to undercut would-be competitors, which is the strongest during these temporary oversupply periods.

10.    Fourth, Defendant RealPage facilitates direct information exchanges between competitors and provides opportunities for direct coordination of prices.  It hosts online forums, organizes in-person events for its clients,[5] and maintains standing committees of cartel members to advise on pricing strategy.[6]

11.    As the property managers acknowledge, they are competitors.  Yet, RealPage's clients shared a common goal of increasing rent prices across the board and understood that RealPage – which has been explicit that its aim is to help its clients "outperform the market [by]3% to 7%"[7] – was the means by which to do it.  RealPage's clients include many of the largest property managers in the Greater Denver Metro Area, who control a majority of the rental units in desirable neighborhoods.  A recent analysis conducted by ProPublica showed that rents in areas where RealPage clients control a high percentage of rental units have increased at a significantly higher rate than those where the company's influence is weaker.[8]

---

[4]      Revenue Management: Proven in Any Market Cycle: See How These Companies Outperformed During Downturns (2020) (ebook), https://www.realpage.com/ebooks/outperform-in-a-down-market/.

[5]      *See* Susan Gaide, *Real World 2022 Customer Conference Recap*, REALPAGE, INC., (July 29, 2022), https://www.realpage.com/blog/realworld-2022-customer-conference-recap/ (last visited Dec. 7, 2022).

[6]      *User Group Overview*, REALPAGE, INC., https://www.realpage.com/user-group/overview/ (last visited Dec. 7, 2022).

[7]      Vogell, *supra* note 1 (citing RealPage web page which has since been removed).

[8]      *Id*.

12.     Specifically, within the Greater Denver Metro Area, **both** rents **and** vacancy rates had been trending higher from 2015-2020,[9] demonstrating that the forces of supply and demand no longer control the price of rent in the Greater Denver Metro Area.

13.     Defendants' price fixing conspiracy is a *per se* unlawful restraint of trade under Section 1 of the Sherman Act. It has resulted in artificially inflated rent prices and a diminished supply of rental units in the Greater Denver Metro Area. Plaintiff and the Class, who rent in the Greater Denver Metro Area from property managers that use RealPage's software, paid significant overcharges on rent and suffered harm from the reduced availability of rental units they could reasonably afford.

## II.     JURISDICTION AND VENUE

14.     Plaintiff brings this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. §1).

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15(a), 26).

16.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§15, 22, and 26), and pursuant to 28 U.S.C. §1391(b), (c), and (d), because, at

---

[9]     Due to conditions caused by the COVID-19 pandemic that will take years to unwind (including generally slowed construction of new apartment units and restrictions on the availability of evictions), current vacancy numbers do not accurately reflect market forces.

all relevant times, one or more of the Defendants resided, transacted business, was found, is licensed to do business, and/or had agents in this District.

17.     This Court has personal jurisdiction over each Defendant because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; (b) leased residential units to individuals throughout the United States, including in this District; and/or (c) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

18.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

19.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## III.    THE PARTIES

20.     Plaintiff Jeffrey Weaver is a resident and citizen of the State of Colorado. Mr. Weaver rented residential units in properties managed by Lessor Defendants Bell Partners, Inc. and Camden Property Trust, including Bell Denver Tech Center and Camden Belleview Station, in Denver, Colorado, beginning in 2017 through the date of this filing. Mr. Weaver has paid higher rental prices by reason of the violations alleged herein.

21.     Defendant RealPage is a corporation headquartered in Richardson, Texas, organized and existing under the laws of Delaware.  RealPage provides software and services to managers of residential rental apartments, including the YieldStar/AI Revenue Management software described herein.  RealPage was a public company from 2010 until December 2020, when it was purchased by Chicago-based private equity firm Thoma Bravo, LP, in a transaction

that valued RealPage at approximately $10.2 billion.[10]  At that time, RealPage had over 31,700

clients, including each of the 10 largest multifamily property management companies in the U.S.

22.    Defendant Allied Orion Group, LLC ("Allied Orion") is a limited liability

company headquartered in Houston, Texas, organized and existing under the laws of Texas.

Allied Orion manages over 20,000 apartments nationally, including approximately 500

apartments in the Denver Metro area.

23.    Defendant AvalonBay Communities, Inc. ("Avalon") is an equity real estate

investment trust ("REIT") headquartered in Arlington, Virginia, organized and existing under the

laws of Maryland. Avalon  manages approximately 300 apartment communities in 25 markets

nationally, including at least 4 apartment communities and approximately 1,000 apartments in

the Denver Metro area.

24.    Defendant Avenue5 Residential, LLC ("Avenue 5") is a limited liability company

headquartered in Seattle, Washington, organized and existing under the laws of Delaware.

Avenue 5 is a residential apartment manager with over 86,000 rental units under its management,

including approximately 2,000 apartments in the Denver Metro area.

25.    Defendant Bell Partners, Inc. ("Bell Partners") is a corporation headquartered in

Greensboro, NC, organized and existing under the laws of North Carolina.  Bell Partners

manages approximately 69,000 apartments nationally, including over 3,200 apartments in the

Denver Metro area.

26.    Defendant BH Management Services, LLC ("BH") is a limited liability company

headquartered in Des Moines, IA, organized and existing under the laws of Iowa.  BH manages

---

[10]    Press Release, RealPage, Inc., Thoma Bravo Completes Acquisition of RealPage (Apr.
22, 2021), https://www.realpage.com/news/thoma-bravo-completes-acquisition-of-realpage/.

over 106,000 apartments nationally, including approximately 1,700 apartments in the Denver
Metro area.

27.     Defendant Camden Property Trust ("Camden") is a real estate investment trust
headquartered in Houston, Texas, organized and existing under the laws of Texas. Camden is a
residential apartment manager with over 58,000 rental units under its management, including
approximately 2,900 units in the Denver Metro area.

28.     Defendant Cortland Partners, LLC ("Cortland") is a limited liability company
headquartered in Atlanta, GA, organized and existing under the laws of Georgia. Cortland
manages over 58,000 apartments nationally, including approximately 4,700 apartments in the
Denver Metro area.

29.     Defendant Cushman & Wakefield, Inc. ("Cushman & Wakefield") is a
corporation headquartered in New York, NY, organized and existing under the laws of Delaware.
Cushman & Wakefield manages over 172,000 apartments nationally, including approximately
2,200 apartments in the Denver Metro area.

30.     Defendant Equity Residential ("Equity") is a real estate investment trust
headquartered in Chicago, Illinois, organized and existing under the laws of Maryland. Equity is
residential apartment manager with over 80,000 rental units under its management, including
approximately 2,500 apartments in the Denver Metro area.

31.     Defendant FPI Management, Inc. ("FPI") is a corporation headquartered in
Folsom, California, organized and existing under the laws of California. FPI is a residential
property manager with over 140,000 units under its management, including approximately 1,200
apartments in the Denver Metro area.

32.    Defendant Greystar Real Estate Partners, LLC ("Greystar") is a limited liability company headquartered in Charleston, South Carolina, organized and existing under the laws of Delaware.  Greystar is by far the largest manager of residential rental apartments in the country, with over 698,000 units under its management, including approximately 14,300 apartments in the Denver Metro area.

33.    Defendant Independence Realty Trust, Inc. ("IRT") is a real estate investment trust headquartered in Philadelphia, PA, organized and existing under the laws of Maryland.  IRT is a residential apartment manager with over 36,000 rental units under its management, including approximately 2,300 apartments in the Denver Metro area.

34.    Defendant Lincoln Property Company ("Lincoln") is a corporation headquartered in Dallas, Texas, organized and existing under the laws of Texas.  Lincoln is residential apartment manager with over 210,000 rental units under its management, including approximately 1,800 apartments in the Denver Metro area.

35.    Defendant Lyon Management Group, Inc. ("Lyon") is a corporation headquartered in Newport Beach, CA, organized and existing under the laws of California.  Lyon manages over 8,000 apartments nationally, including approximately 400 apartments in the Denver Metro area.

36.    Defendant Mid-America Apartment Communities, Inc. ("MAA") is a corporation headquartered in Germantown, Tennessee, organized and existing under the laws of Tennessee.  MAA is a residential apartment manager with over 100,000 rental units under its management, including approximately 1,100 apartments in the Denver Metro area.

37.    Defendant Security Properties Inc. ("Security") is corporation headquartered in Seattle, Washington organized and existing under the laws of Washington.  Security is a

residential apartment manager with over 22,000 rental units under its management: including approximately 2,100 apartments in the Denver Metro area.

38.     Defendant UDR, Inc. ("UDR") is a corporation headquartered in Highlands Ranch, CO, organized and existing under the laws of Maryland.  UDR is a residential apartment manager with over 56,000 rental units under its management, including approximately 510 apartments in the Denver Metro area.

39.     Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

40.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.  Each of the Defendants named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

41.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

IV.     **FACTUAL ALLEGATIONS**

    A.     **Historical Competition Among Residential Property Managers**

42.     Before the introduction of software like YieldStar, competition in the rental housing market was driven by property managers' desire to keep occupancy levels in their

buildings as high as possible and to keep turnover among their tenants down.[11]  In addition to lost rent revenue caused by letting apartments sit empty, the costs of owning and maintaining a rental apartment are not significantly different whether the unit is occupied or not.  This provides a strong incentive for property managers to lower their rents to fill vacant units.  While property managers knew in theory that if they all resisted this temptation, they would all benefit from higher average rents, any individual property manager that lowered its rents to fill vacancies while the others did not would be able to gain market share at the others' expense.

43.    As Donald Davidoff, the principal developer of the competing price-setting software that Defendant RealPage acquired in 2017, Lease Rent Options, explained in a 2020 blog post: "All [property managers] would be better off limiting their rent reductions; however, should one [property manager] lower their rents while the others don't, then that operator would outperform.  The result can be a race to the bottom that is not good for anyone, but the fear of missing out coupled with laws prohibiting collusion make this the most likely outcome."[12]  This so-called "race to the bottom" might be bad for all property managers but is, of course, good for renters.  It represents nothing beyond healthy price competition.

44.    Absent collusion, property managers could not unilaterally raise rents above market rates—any property manager that did so would lose tenants to its competitors who offered rental units at market rates, granting them a higher share of the available profits.  This dynamic causes rental prices in a competitive marketplace to be sensitive to changes in demand.  For example, rents have historically gone up quickly in neighborhoods that become trendy, or

---

[11]    *Supra* note 4.

[12]    Donald Davidoff, *They're Heckling Revenue Management Again*, THE DEMAND SOLUTIONS BLOG (Aug. 18, 2020), https://www.d2demand.com/mfhblog/theyre-heckling-revenue-management-again.

when new public transportation infrastructure is added, and have fallen in areas where businesses close, or that new generations find less desirable than previous ones did. Any number of factors that made people want to live in a certain area or a certain type of apartment could cause rents to rise or fall accordingly. Rents were also historically responsive to changes in renters' average income.

45. As described more fully below, Defendants' conspiracy avoids a race to the bottom, but it does so at the financial expense of their customers —the renters. It allows property managers to hike rents at a faster pace when demand is strong without needing to lower them when it is weak. It eases natural competitive constraints and causes renters to spend higher and higher portions of their incomes on housing.

**B.     RealPage and AI Revenue Management**

46. Defendant RealPage markets a "comprehensive platform of data analytics and on demand software solutions and services for the rental real estate industry."[13] Its clients are managers of residential rental apartments, to which it offers an array of products for (1) marketing and leasing of apartments, (2) resident experience (including IT portals and rent payment software), (3) site management, (4) vendor and expense management, (5) budgeting and investment, (6) accounting, (7) data analytics, and (8) so-called "revenue management" – advisory services on how to obtain higher rents on every unit. This "revenue management" service is the fulcrum of Defendants' anticompetitive scheme.

---

[13]     RealPage Inc., Annual Report (Form 10-K) at 6 (Mar. 1, 2021).

47.    RealPage was founded in 1998, and in 2002 it acquired the original YieldStar software from Defendant Camden.[14]  Two years later, the company hired Jeffrey Roper as its principal scientist to improve YieldStar's performance and grow its client base.[15]  Roper saw potential in the software as a means for RealPage's customers to increase their revenue by maintaining higher average rents, but he realized that to function properly, the algorithm needed huge amounts of detailed data regarding rent prices and occupancy of individual units.[16]  RealPage began collecting information from its clients and other sources in a "data warehouse," which the algorithm could mine.  Beyond rent prices and occupancy rates, this data included records of actual lease transactions, signed lease documents, lease renewal dates, records of rent payments, and detailed data on tenants and their finances.

48.    Roper had previously helped design similar price-setting software for Alaska Airlines that also facilitated information exchange and price-fixing, according to the DOJ.[17]  During his tenure as director of revenue management, Alaska Airlines and its competitor airlines began using common software to exchange information regarding planned routes and ticket prices among themselves before that information became public.[18]  The software allowed the airlines to avoid price wars that would have lowered ticket prices.  The Justice Department's Antitrust Division filed suit against eight of the largest U.S. airlines, alleging that the software-

---

[14]    Press Release, RealPage, Inc., RealPage Acquires YieldStar Multifamily Revenue Management System (July 19, 2002), https://www.realpage.com/news/realpage-acquires-yieldstar-multifamily-revenue-management-system/.

[15]    *See* Vogell, *supra* note 1.

[16]    *See id.*

[17]    Press Release, U.S. Dep't of Just., Justice Department Settles Airlines Price Fixing Suit, May Save Consumers Hundreds of Millions of Dollars (Mar. 17, 1994), https://www.justice.gov/archive/atr/public/ press_releases/1994/211786.htm.

[18]    Vogell, *supra* note 1.

enabled information exchange amounted to anticompetitive price fixing under the antitrust laws.[19]  A government economist calculated that the scheme cost consumers up to $1.9 billion.[20]  All eight airlines eventually entered into consent decrees requiring them to eliminate the information exchange features of the software that had enabled the conspiracy.[21]  At one point during the investigation, federal agents removed a computer and documents from Roper's office at Alaska Airlines.[22]

49.    Much like the airlines' price-fixing cartel, Defendants' cartel avoids price wars and the "race to the bottom" during periods of oversupply.  As Defendant RealPage declares to potential clients in its advertising materials: "You don't have to sacrifice rent growth during a softening market."[23]

50.    Naturally, YieldStar's coordinated pricing strategy became more and more effective as more property managers implemented it.  To this end, Defendant RealPage began buying up similar and competing software companies, and it has completed 26 acquisitions since its founding.[24]  The most important of these transactions came in 2017, when RealPage acquired Lease Rent Options ("LRO"), a company which offered a similar rent-setting software that was YieldStar's strongest rival.  Instead of relying on nonpublic data from competitors, however, LRO's algorithm used only public market data as input.  LRO's chief architect, Donald

---

[19]    Press Release, U.S. Dep't of Just., Justice Department Files Price Fixing Suit Against Eight Airlines and Fare Dissemination System (Dec. 21, 1992), https://www.justice.gov/archive/atr/public/ press_releases/1992/211323.htm.

[20]    *Supra* note 16.

[21]    *Supra* note 16.

[22]    Vogell, *supra* note 1.

[23]    *Supra* note 4.

[24]    Bloomberg Company Report, RealPage, Inc. (generated Nov. 1, 2022).

Davidoff, designed it that way specifically to avoid the potential antitrust violations arising from the use of nonpublic data to coordinate prices among competitors.[25]

51.    LRO's software was not the most valuable piece of the acquisition for Defendant RealPage, however – its customer base was.  At the time of the merger, RealPage was pricing 1.5 million units.  That number doubled with the acquisition.[26]  RealPage rebranded the product AI Revenue Management, and its client base and influence on rental markets in urban areas across the country continued to grow.  RealPage's website currently claims that its clients use AI Revenue Management to set the price for more than four million rental units.[27]  While the DOJ issued a so-called "Second Request" in connection with the proposed merger due to its potential effects on competition, DOJ took no further action, and RealPage completed the acquisition.[28]

52.    These four million units provide only a piece of the data available for Defendant RealPage's algorithm to mine, however.  According to RealPage's last annual report before being acquired by Thoma Bravo, as of December 31, 2020, its "client base of over 31,700 clients used one or more of [its] integrated data analytics or on demand software solutions to help manage the operations of approximately 19.7 million rental real estate units."[29]

53.    Defendant RealPage's vast client base provides it with real-time data on every aspect of the rental housing market, including actual rent prices as opposed to advertised rents — data which was previously unavailable to landlords.  RealPage advertises that the algorithm

---

[25]    Vogell, *supra* note 1.

[26]    *Id.*

[27]    *RealPage    AI    Revenue    Management*,    REALPAGE,    INC., https://www.realpage.com/assetoptimization/revenue-management/ (last visited Nov. 1, 2022).

[28]    Vogell, *supra* note 1.

[29]    *See* RealPage Inc., Annual Report (Form 10-K) at 6 (Mar. 1, 2021).

"crunches *millions of transactions each night*, pinpointing price shifts for *every single unit* on
the platform at any point in time."[30]

54.    Figure 1, below, is a diagram from an eBook published by Defendant RealPage
on its website.[31]  It demonstrates how RealPage aggregates the data (including nonpublic lease
transaction data) which enables RealPage to coordinate pricing among its clients.

**Figure 1**



55.    By enabling property managers to outsource lease pricing decisions to the
software, Defendant RealPage has transformed rental markets.  Where lease prices were formerly
set to maximize occupancy rates, increasing revenue on individual rental units has become the
driving force.  David Hannan, senior vice president at the Morgan Group, a Houston-based
property manager, which grew revenue 5% above expectations when it implemented YieldStar,
characterized the transformation like this: "My generation grew up worshipping the occupancy

---

[30]    *YieldStar Calculates the Right Rent Price at the Right Time*, REALPAGE VIDEOS,
https://www.realpage.com/videos/yieldstar-measures-price-elasticity/ (last visited Nov. 1, 2022)
(emphasis added).

[31]    3 WAYS TO LEVERAGE AI FOR MAXIMUM NOI 8 (2022), https://www.realpage.com
/ebooks/leverage-ai-maximum-noi/.

gods.  We learned that if you were not 95 percent-plus occupied, the asset was failing.  But that's

not necessarily true anymore . . . [t]his totally turns the industry upside down."[32]  RealPage

characterizes this transformation as a shift from an "occupancy focus" to "rent growth focus."[33]

56.    Other traditional aims for a healthy rental property, such as low turnover rates,

have also been abandoned.  Ric Campo, the CEO of Defendant Camden said his turnover rates

increased around 15 percentage points in 2006 after implementing YieldStar.  Despite that

increase in turnover rates, Defendant Camden's overall same-property revenue grew over 7% in

its first year using YieldStar.  "What we found," Campo said, "was that driving our turnover rate

up actually captured additional revenue."[34]  While Camden's turnover expenses increased by

$2.5 million, revenue increased $12.5 million.  According to Campo, "[t]he net effect of driving

revenue and pushing people out was $10 million in income."[35]

57.    Additionally, Defendant RealPage provides its customers with real-time

information about their competitors sufficient to avoid oversupply of units caused by natural

ebbs and flows in the market.  The algorithm uses the occupancy data it collects to recommend

lease renewal dates that are staggered to avoid any period of oversupply.  Property managers can

then hold units vacant for a period, while keeping rent prices inflated.[36]  This strategy of

staggering of lease renewal dates smooths out natural fluctuations of supply and demand, which

---

[32]    Joe Bousquin, *In the Back Office, Revenue Management Software is Causing a
Revolution*, MULTIFAMILY    EXECUTIVE    (Apr.    20,    2009),
https://www.multifamilyexecutive.com/technology/in-the-back-office-revenue-management-
software-is-causing-a-revolution_o (last visited on Dec. 8, 2022).

[33]    *Supra* note 4.

[34]    Bousquin, *supra* note 44.

[35]    *Id.*

[36]    *See supra* note 4, at 4-5.

further reduces any incentive for Defendants and their coconspirators to undercut their inflated prices. This incentive is always the greatest in periods of oversupply, when falling revenues could be replaced by achieving full occupancy at reduced rents.

      **C.**    **Property Managers Who Adopted YieldStar/AI Revenue Management Did So with the Common Goal of Raising Rent Prices**

     58.    Property managers who use YieldStar/AI Revenue Management do so with the explicit and common goal of increasing rents for all members of the cartel by using coordinated algorithmic pricing. Defendant RealPage advertises that its customers "outperform the market by 2%-7% year over year,"[37] by switching from an "occupancy focus" to a "rent growth focus."[38] RealPage's clients find its revenue management services particularly helpful because those services allow the property managers to "make sure we're limiting our supply when there isn't too much demand."[39] As one property manager described in a promotional video on RealPage's website, YieldStar takes on the burden of "implementing the increases in rents . . . it's running the lease expiration for us and we're not manually doing it which means we're increasing our revenue for those units."[40]

---

[37]    *Introducing AI Revenue Management: Next-Generation Price Optimization That Unlocks Hidden Yield,* REALPAGE, INC. (2020), https://www.realpage.com/storage/files/pages/pdfs/2021/02/ai-revenue-management-look book-nov20.pdf.

[38]    *Supra* note 4, at 3.

[39]    *RealPage Revenue Management Maximizes Market Opportunity,* REALPAGE VIDEOS (Dec 2, 2019), https://www.realpage.com/videos/revenue-management-maximizes-market-opportunity/ (interview with John Kirchmann, CFO of IRET Property Management).

[40]    *YieldStarTM Revenue Management Optimizes Rent Pricing,* REALPAGE VIDEOS (Sept. 10, 2019), https://www.realpage.com/videos/yieldstar-optimizes-rent-pricing/ (testimonial of Holly Casper, Vice President of Operations for RKW Residential).

59.     To join the cartel, property managers must agree to abide by certain conditions. They must provide Defendant RealPage with real-time access to detailed, nonpublic data regarding their residential leases.  They must agree to outsource daily pricing and ongoing revenue oversight to RealPage.  Importantly, they agree to rent their units at the algorithm's recommended price, even where it is higher than they would have previously considered.  While it is possible for property managers to reject the algorithm's suggested price for a given unit, RealPage uses multiple mechanisms to enforce what it refers to as pricing "discipline" or "courage."  The result is that property managers adopt at least 80% and as much as 90% of suggested rates.[41]

60.     Defendant RealPage provides participating property managers with daily recommended rents for available rental units.  The property manager must either accept these rates or provide justification to a RealPage Revenue Management Advisor for their divergence from the recommended price.  And, according to a former RealPage executive, property managers only ever offered minimal pushback on the recommended rates.[42]

61.     Unlike renters, Defendant RealPage's customers (the property managers) are fully aware when they sign up that the higher rents achieved by using the algorithm are the result of coordinated pricing among competing property managers.  Before the introduction of rent-setting software, markets for residential leases were characterized by a prisoner's dilemma.  While higher rents across the board would benefit all landlords, one self-interested landlord could outperform the rest by undercutting the price and achieving full occupancy.  Without assurances

---

[41]     *See* Vogell, *supra* note 1.

[42]     *See id.*

that competitors will refrain from undercutting rent prices, individual landlords are forced to price their units to maximize occupancy.

62.     By enforcing price discipline and setting rents that result in lower occupancy rates, Defendant RealPage provides assurances that all property managers using its software are doing the same thing – raising rents and accepting lower occupancy instead of lowering the price to fill units.   In this way, RealPage enables property managers to overcome the prisoner's dilemma that prevented coordinated pricing in the historical market for residential rental apartments.[43]

63.     Defendant RealPage's clients are also aware that the rent growth they achieve is based on real-time sharing of nonpublic lease transaction and pricing data.   RealPage calls this information exchange "continuous optimization through connected intelligence" and brags that it is "[b]uilt on the market's largest real-time data set."[44]   Coordinated algorithmic pricing allows property managers to, in RealPage's own words, "outsource daily pricing and ongoing revenue oversight" to RealPage, allowing RealPage to set prices for client property managers' properties "as if we [RealPage] own them ourselves."   Put differently, the software allows the independent property managers to operate as if they were one company setting prices.

### D.     The Conspiracy Caused Inflated Rental Prices and Reduced Occupancy of Residential Rental Units in the Greater Denver Metro Area

64.     Defendant RealPage's model works to increase revenue by raising rent prices while accepting lower occupancy levels.   RealPage has not been shy about this mechanism of

---

[43]     *See* Salil K. Mehra, Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable Cartels, 26 STAN. J.L. BUS. & FIN. 171, 197-203 (2021).

[44]     *Introducing AI Revenue Management: Next-Generation Price Optimization That Unlocks Hidden Yield,* REALPAGE, INC. (2020), https://www.realpage.com/storage/files/pages/pdfs/2021/02/ai-revenue-management-lookbook-nov20.pdf.

action.  During a 2017 earnings call, then-CEO of RealPage Steve Winn offered as an example

one large property company, managing over 40,000 units, which learned it could make more

profit by operating at a lower occupancy level that "would have made management

uncomfortable before."[45]  Prior to adopting YieldStar, the company had targeted 97% or 98%

occupancy rates in markets where it was a leader.  After outsourcing rent prices to the algorithm,

the company began targeting 3%-4% revenue growth while operating at a 95% occupancy rate.[46]

65.    Defendant RealPage's software not only facilitates price hikes, but it also allows

conspirators to **maintain** higher prices.  RealPage claims that Defendant property managers and

their coconspirators were able to maintain rent prices 7% above the competitive market rate.

Speaking at a RealPage webcast, America Melragon, a former VP of revenue management for

Defendant IRT, discussed how property managers can stabilize rents by using RealPage's

software.  According to Melragon, "We've noticed . . . competitors that are manually pricing

have already started to experience pretty significant swings in their effective price. . . . For us,

really having that insight into our own individual supply and demand exposure has helped our

price pretty much stay in line with where we anticipated it to be."[47]

66.    Defendants and their co-conspirators are aware that the higher revenues they

obtain using Defendant RealPage's software are the result of increasing average rent prices in the

neighborhoods they serve.  In a video shown at a conference for real estate executives in the

summer of 2021, RealPage vice president Jay Parsons noted that average rents had recently shot

---

[45]    Vogell, *supra* note 1.

[46]    *Id.*

[47]    *IRT Gains Pricing Stability with RealPage Revenue Management*, RealPage Videos (June 17, 2020), https://www.realpage.com/videos/irt-gains-pricing-stability/.

up by 14%. "Never before have we seen these numbers," he said.[48]  Parsons then asked Andrew

Bowen, another RealPage executive, what role he thought the company had played in the

unprecedented increase. "I think it's driving it, quite honestly," Bowen replied.[49]

67.    Defendants' conspiracy allows property managers to hike rents even higher when

demand is strong without needing to lower them when it is weak.  It untethers rent prices from

their natural constraints, forcing renters to spend more money than they would have in a

competitive rental market.

68.    Specific to the Greater Denver Metro Area, Defendants have taken advantage of

the skyrocketing cost of homeownership.  From 2012 to 2020, the percentage of houses sold in

the Greater Denver Metro Area that would have been affordable to a family earning the median

income fell dramatically from ~80% to ~55%.[50]

69.    As a result of the drastic increase in home prices, more and more families in the

Greater Denver Metro Area are renting.

70.    Defendants control at least 620,000 apartment units, including hundreds of

thousands of units in the most desirable neighborhoods.

71.    Yet, in the years preceding the COVID-19 pandemic,[51] vacancies trended

upwards, from under 4.5% prior to 2014 to a peak of 6.5% in 2020.[52]  Within that time, from

---

[48]    Vogell, *supra* note 1.

[49]    *Id.*

[50]    DEP'T OF HOUS. & URBAN DEV., COMPREHENSIVE HOUSING MARKET ANALYSIS: DENVER-AURORA-LAKEWOOD, COLORADO 15 (2021) [hereinafter "HUD Comprehensive Market Analysis"], https://www.huduser.gov/portal/publications/pdf/DenverAuroraLakewoodCO-CHMA-21.pdf (last visited on Dec. 8, 2022).

[51]    *See* generally note 9, *supra*, explaining why current occupancy rates are not reflective of market conditions.

[52]    *See* Figure 2, *infra*.

year-to-year, vacancies in the Greater Denver Metro Area fell some years (*e.g.*, 2016-17, 2018-19), were flat other years (*e.g.*, 2014-15), and rose dramatically other years (*e.g.*, 2015-16, 2017-18, 2019-20).

72. Despite this, with the help of RealPage, Defendants were able to continue to raise rents year over year over year, regardless of whether vacancies were rising, falling, or flat, demonstrating the disconnect between supply and demand:

**Figure 2: Rent vs. Occupancy in Greater Denver Metro Area (2014-22)**



### E. "Plus Factors" in the Residential Rental Market Provide Additional Evidence of a Price Fixing Conspiracy

73. Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but

largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[53]  Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism.  The factors that provide the most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."[54]

74.    Here, several plus and super plus factors support the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel.  These include: (i) Defendants' exchange of competitively sensitive information, (ii) the presence of a price-verification scheme, (iii) a motive to conspire, (iv) opportunities and invitations to collude, (v) high barriers to entry, (vi) high switching costs for renters, (vii) high market concentration, (viii) stability in the market shares of large residential apartment managers, and (ix) maintenance of excess capacity during periods of rising prices.

75.    *First*, the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[55]  As described above, Defendant RealPage requires client property managers to input data on actual rents paid and occupancy rates, along with detailed records of lease transactions.  This data, which would normally be kept private, is fed into the algorithm which sets coordinated rents among competing property managers.  Importantly, individual property managers would be competitively disadvantaged by providing private data to other property

---

[53]    William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

[54]    *See id*. at 396-97.

[55]    Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 NW. UNIV. L. REV. 1581, 1608 (2021).

managers unilaterally, and rational actors will only do so with the expectation that they will benefit from similar private information shared by its competitors.

76.    *Second*, Defendant RealPage provides participating property managers with a price-verification scheme.  As described above, RealPage pushes its clients to accept the algorithm's rent price at least 80%-90% of the time and clients cannot freely diverge from the algorithm's price.  This type of price-verification makes little sense absent collusion.[56]

77.    *Third*, Defendant RealPage provides property managers with a motive to conspire by advertising its software and claiming it can increase revenue by 3% to 7%.[57]

78.    *Fourth*, the YieldStar/AI Revenue Management software itself is an opportunity to coordinate prices that was previously unavailable, and Defendant RealPage's advertisements are naked invitations to collude.  Additionally, RealPage hosts online forums and in-person conferences for property managers[58] and maintains standing committees of cartel members to advise on pricing strategy,[59] all of which provide opportunities for more direct collusion.

79.    *Fifth*, the market for residential apartment rentals is highly concentrated. Desirable neighborhoods in many major cities are dominated by large corporate property managers, such as Defendants Greystar and Camden, which are themselves increasingly controlled by even larger private equity firms.[60]  For example, ProPublica found that in one

---

[56]    *Id.* at 1602.

[57]    *Proven in any Market Cycle*, RealPage eBook, *supra* note 10, at 6.

[58]    *RealWorld 2022: The Pursuit of Excellence,* REALPAGE, INC., https://www.realpage.com/realworld/ (last visited Nov. 1, 2022).

[59]    *User Group Overview*, REALPAGE, INC., https://www.realpage.com/user-group/overview/ (last visited Nov. 1, 2022).

[60]    Heather Vogell, *When Private Equity Becomes Your Landlord,* PROPUBLICA (Feb. 7, 2022),                                                                                    https://www. propublica.org/article/when-private-equity-becomes-your-landlord.

popular Seattle neighborhood, 70% of the apartments were managed by just 10 property managers, all of which were using Defendant RealPage's pricing software.[61]

80.    *Sixth*, multifamily residential building owners and operators face significant entry barriers.   These include the high cost of acquiring property and establishing a property management infrastructure as well as ongoing costs of building maintenance and regulatory compliance.  Even small multifamily rental properties cost millions of dollars to acquire.  Larger properties run into the hundreds of millions of dollars to own and manage and take several years and significant experience to build or acquire.  Thus, new entrants into the residential real estate leasing market are unlikely to discipline cartel pricing.

81.    *Seventh*, there are significant switching costs that prevent effective price competition in rental markets.  In other markets with low switching costs, consumers can stop purchasing a particular manufacturer's product when its prices are no longer competitive.  Rental contracts, however, are usually for a term of at least one year.  Renters who break their lease during the rental term will likely face significant financial penalties for doing so.  These penalties may include, among other things: the forfeiture of a security deposit (typically at least one month's rent), or the requirement that the renter is to continue paying rent until the property is re-leased.  Because of these high switching costs, renters cannot readily switch from one rental unit to another in the event their current rental unit no longer aligns with market prices.  This creates a certain degree of natural market power for owners of rental properties and makes collusion more effective because even if a competing property manager were to offer lower prices on available units, customers will not typically break their leases to enter a lease for a lower cost property given the substantial cost of doing so.

---

[61]    Vogell, *supra* note 1.

82.    *Eighth*, the relative market share held by the largest residential apartment managers has been remarkably stable.  Since 2018, the list of the top 10 apartment managers in the country has been virtually identical, with a total of 13 companies appearing on the combined list.  The small variance is due largely to the merger between two of the top five apartment managers in 2020.[62]  Stability of relative market shares indicates a market that lacks dynamic competition.

83.    *Finally*, Defendant RealPage's clients maintain excess capacity while simultaneously raising prices.  As described above, the ability of RealPage's clients to increase their revenue depends on them continuing to raise rental prices while simultaneously maintaining a higher vacancy rate than they would have independently.  This is evidence of collusion because in a competitive market, firms with surplus inventory normally reduce prices to grow market share.[63]  As described above, RealPage and its clients are open about how they can achieve higher revenues while maintaining a lower occupancy rate than they could setting prices independently.

## V.    RELEVANT MARKET

84.    The relevant product market is the market for the lease of multifamily residential real estate and the relevant geographic market is the Greater Denver Metro Area, as defined above.

---

[62]    *NMHC 50 Largest Apartment Managers,* Multifamily Housing Council, https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2022-top-managers-list/ (2022); https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2021-top-manager-list/ (2021); https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2020-top-managers-list/ (2020); https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2019-managers-list/ (2019); https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2018-manager-list/ (2018) (last visited Nov. 1, 2022).

[63]    *See* Leslie, *supra* note 49, at 1606.

85.     Multifamily real estate leases in the Greater Denver Metro Area comprise a distinct product market and geographic area.

86.     Consumers do not consider apartments, condominiums, or houses for purchase as substitutes for multifamily rental apartment units because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing. Nor is single-family real estate considered an economic substitute for multifamily residential real estate. For example, single-family properties typically do not offer amenities and security.

87.     Geographically, given that commuting distance to a place of work or school is a significant (if not the primary) geographic constraint on where a person chooses to live, renters in the Greater Denver Metro Area do not consider multifamily residential leases in other metro areas, even ones that are relatively close by like Albuquerque, NM, Salt Lake City, UT, or Kansas City, MO, as adequate substitutes for multifamily residential leases in the Greater Denver Metro Area, because the daily commute from those cities to Denver would take multiple hours in each direction.

## VI.    CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action on behalf of himself and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities who paid rent for a residential unit in the Greater Denver Metro Area which was owned, managed, or controlled by a Defendant using YieldStar, AI Revenue Management, or any other RealPage software from January 1, 2016, to the present.

89.     Specifically excluded from this Class are Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded from this Class

are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

90.     The Class is so numerous as to make joinder impracticable.  Plaintiff does not know the exact number of Class members because such information presently is in the exclusive control of Defendants.  Plaintiff believes that due to the nature of the residential rental market there are likely tens of thousands of Class members in the Greater Denver Metro Area.

91.     Common questions of law and fact exist as to all members of the Class.  Plaintiff and the Class were injured by the same unlawful price fixing conspiracy, and Defendants anticompetitive conduct was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate.  Common issues of fact and law include, but are not limited to the following:

> a) Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize rent prices for residential units in the Greater Denver Metro Area;
>
> b) The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;
>
> c) Whether such combination or conspiracy violated the federal antitrust laws;
>
> d) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiff and other members of the Class;

e) Whether Defendants caused Plaintiff and the Class to suffer damages in the form of overcharges on rent for residential units;

f) The appropriate class-wide measure of damages; and

g) The nature of appropriate injunctive relief to restore competition in the Greater Denver Metro Area residential apartment rental market.

92.     Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated rent for residential units managed cartel members.

93.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.  Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

94.     Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

95.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

96.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress

for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

97.     Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VII.    ANTITRUST INJURY

98.     Defendants' anticompetitive conduct had the following effects, among others:

(a)     Competition among Defendants has been restrained or eliminated with respect to residential rental units in the Greater Denver Metro Area;

(b)     The price of residential rental units in the Greater Denver Metro Area has been fixed, stabilized or maintained at artificially high levels; and

(c)     Individuals have been deprived of free and open competition.

99.     Defendants' violations of the antitrust laws have caused Plaintiff and the Class to pay higher prices for residential rental units in the Greater Denver Metro Area than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages in the form of overcharges paid on their rental units.

100.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   FRAUDULENT CONCEALMENT

101.    Plaintiff and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants

engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix residential rental unit prices in the Greater Denver Metro Area.

102.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, sharing non-public data via YieldStar/AI Revenue Management, secret meetings, surreptitious communications between Defendants by the use of telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor or supply restraint communications on documents, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators.  The conspiracy was by its nature self-concealing.

103.    Throughout the Class Period set forth in this Complaint, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and Class members.

104.    The residential rental market is not exempt from antitrust regulation, and thus, before October 15, 2022, when ProPublica published the article "Rent Going Up? One Company's Algorithm Could Be Why" Plaintiff reasonably considered it to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' rental practices.

105.    Plaintiff exercised reasonable diligence.  Plaintiff and the members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

106.    By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## IX.    CLAIMS FOR RELIEF

### COUNT I

### Price Fixing in Violation of
### Section 1 of the Sherman Act (15 U.S.C. §1)

107.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

108.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to unreasonably restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

109.    The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the rents they charge for residential units in the Greater Denver Metro Area and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

110.    Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on rent.

111.    Defendants' anticompetitive conduct had the following effects, among others:

    a)    Competition among Defendants has been restrained or eliminated with respect to residential rental units in the Greater Denver Metro Area;

b) The price of residential rental units in the Greater Denver Metro Area has been fixed, stabilized or maintained at artificially high levels; and

c) Individuals have been deprived of free and open competition.

112. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

113. Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT II

### Price Fixing in Violation of Section 104 of the Colorado Antitrust Act of 1992 (C.R.S.A § 6-4-104)

114. Plaintiff repeat the allegations set forth above as if fully set forth herein.

115. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to unreasonably restraint of trade in violation of Section 104 of the Colorado Antitrust Act of 1992 (C.R.S.A. § 6-4-101).

116. The conspiracy among and between Defendants constitutes a per se violation of the Colorado Antitrust Act. Alternatively, the unlawful conspiracy caused anticompetitive effects that substantially outweigh any procompetitive justification, if any exist, in violation of the rule of reason analysis under the Colorado Antitrust Act.

117.    By preventing the competitive pricing of residential leases in Colorado, Defendants deprived Plaintiff and the Class the benefits of the competition that the Colorado Antitrust Act was designed to promote, preserve, and protect.

118.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the Class have been required to pay inflated rental prices that would not have existed in the absence of illegal collusion.

119.    Plaintiff and members of the Class are entitled to treble damages, attorneys' fees, and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT III
### Unjust Enrichment

120.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

121.    Defendants have been unjustly enriched at the expense of Plaintiff and the Class. Specifically, as described throughout, Defendants' anticompetitive conduct has caused Plaintiff and the Class to pay higher prices for residential rental units in the Greater Denver Metro Area than they would have in the absence of Defendants' illegal contract, combination, or conspiracy. And as a result, Plaintiff and the Class have suffered damages in the form of overcharges paid on their rental units.

122.    There was no valid justification for Defendants unjust enrichment.

123.    Defendants anticompetitive conduct has been to the detriment of Plaintiff, and allowing Defendants to retain these benefits violates fundamental principles of justice, equity, and good conscience.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class of all others so similarly situated, respectfully request that:

A.      The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or full-fledged rule of reason violation) of Section 1 of the Sherman Act (15 U.S.C. §1);

C.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.      The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: December 14, 2022          /s/ Rusty E. Glenn
                                 Rusty E. Glenn
                                 **SHUMAN, GLENN & STECKER**
                                 600 17th Street, Suite 2800 South
                                 Denver, CO 80202
                                 Telephone: (303) 861-3003
                                 Facsimile: (303) 536-7849
                                 rusty@shumanlawfirm.com

                                 *Local Counsel for Plaintiff*

                                 David R. Scott
                                 Amanda Lawrence
                                 Patrick McGahan
                                 Michael Srodoski
                                 G. Dustin Foster
                                 **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                 156 South Main Street
                                 P.O. Box 192
                                 Colchester, CT 06145
                                 Telephone: (860) 537-5537
                                 Facsimile: (860) 537-4432
                                 david.scott@scott-scott.com
                                 alawrence@scott-scott.com
                                 pmcgahan@scott-scott.com
                                 msrodoski@scott-scott.com
                                 gfoster@scott-scott.com

                                 Thomas J. Undlin
                                 Stacey Slaughter
                                 Geoffrey H. Kozen
                                 J. Austin Hurt
                                 **ROBINS KAPLAN LLP**
                                 800 LaSalle Avenue, Suite 2800
                                 Minneapolis, MN 55402
                                 Telephone: (612) 349-8500
                                 Facsimile: (612) 339-4181

tundlin@robinskaplan.com
sslaughter@robinskaplan.com
gkozen@robinskaplan.com
ahurt@robinskaplan.com

Vincent Briganti
Christian P. Levis
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

*Additional Counsel for Plaintiff*